## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 23 2018, 8:46 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Frederick A. Turner
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Johnny Moore,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 23, 2018

Court of Appeals Case No.
53A04-1706-CR-1269

Appeal from the Monroe Circuit Court

The Honorable Teresa D. Harper, Judge

Trial Court Cause No.
53C09-1608-MR-701

**Mathias, Judge.**

[1] Johnny Moore ("Moore") was convicted of felony murder and Level 4 felony burglary in Monroe Circuit Court. Moore raises four issues on appeal which we restate as:

> I. Whether the trial court abused its discretion when it admitted certain evidence at trial;
>
> II. Whether there was sufficient evidence to support Moore's convictions;
>
> III. Whether Moore's convictions for felony murder and burglary violated Indiana's prohibition against double jeopardy; and
>
> IV. Whether Moore's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

[2] Moore and Billie Jean Edison ("B.J.") met in June 2016. Moore supplied B.J. with drugs, and she used two drug runners in Bloomington, Indiana, Regena Dixon ("Dixon") and Ryan Tharp ("Tharp"), to sell the drugs. Moore regularly fronted B.J. drugs and she would then front them to Dixon and Tharp. B.J. was then responsible for paying Moore back once she received money from Dixon and Tharp. B.J. knew two other individuals in Bloomington who she felt would make ideal customers for Moore—Jarrod Crouch ("Crouch") and Brittany Sater ("Brittany"). And B.J. introduced Moore to both of them that summer.

[3] In August 2016, B.J. fronted Tharp roughly $1,000 worth of drugs she received from Moore. Several hours after Tharp was scheduled to return with B.J.'s

money, she had not heard from Tharp and was unable to reach him. B.J. was scared because she knew she needed to pay Moore back the money. B.J. knew that Tharp had previously received his drugs from Brittany, so she visited Brittany in Bloomington to see if Brittany had heard from Tharp. Moore went with B.J., and they were also visiting Britany to see if she wanted to try some of Moore's heroin because they "had heard that her dope wasn't that good." Tr. Vol. 4, p. 158. Brittany called Tharp for B.J., and she also tried the heroin Moore brought, but she did not like it. B.J. visited Brittany three or four times over the next several days to see if she had seen Tharp and also to bring her more drugs.

[4]     On August 27, 2016, Moore called B.J. and told her that they were going to travel to Bloomington "to collect money from [Crouch] . . . and take care of Brittany." *Id.* at 162. Three vehicles traveled to Bloomington that evening: Moore and B.J. in Moore's Cadillac; Dennis Webb ("Webb") in B.J.'s Expedition; and Eric Jones ("Jones") and his female friend in a F-150 Pickup. They arrived in Bloomington around 9:30 p.m. and headed to Crouch's house which he shared with B.J.'s brother Billy Edison ("Billy").

[5]     Moore, B.J., Webb, and Jones all went inside, and Moore and Webb began questioning Crouch about the money and drugs that he owed. Meanwhile, B.J. walked towards the back bedroom to look for her brother Billy. She found Billy holding a Norinco SLS .762 rifle (the "rifle"). Moore noticed Billy holding the rifle, and Moore asked him, "Were you going to shoot me with that f[\*\*\*\*\*\*] gun?" *Id.* at 169. Moore took the gun from Billy and walked back into the living

room where he hit Crouch in the head with the butt of the rifle. Moore then directed Crouch to go with Jones and collect the money he owed. Moore also took the rifle with him for partial payment of Crouch's debt.

[6] Moore, Webb, and B.J. then left Crouch's. Just before leaving, Moore looked at B.J. and told her, "We going to do what we talked about. We're going to Brittany's." *Id.* at 174. Moore had told B.J. "on several [previous] occasions that if Brittany didn't buy dope from [them] that he was going to rob her over and over again so she couldn't buy her own product from someone else." *Id.* at 176. B.J. parked the Expedition with Webb in the passenger seat in a parking lot near Brittany's back door. Moore drove the Cadillac, and he parked nearby in an adjacent parking lot.

[7] B.J. and Webb walked up to Brittany's back door where B.J. knocked. As soon as Brittany opened the door, Webb put the rifle up to her head. Brittany began flailing her arms and trying to knock the gun away. Webb moved the rifle down and pointed it at Brittany's abdomen as he walked her backwards toward her bedroom. Once inside the bedroom, Webb shot Brittany once in the abdomen. B.J. ran frantically outside to Moore's vehicle and told him that Webb had shot Brittany. Moore told B.J. to "get [her] f[******] ass back in the house and help him get the stuff." *Id.* at 194.

[8] When B.J. reentered the house, she saw Webb dragging Brittany towards the safe in the bedroom. Brittany was still alive at the time, but she later died from the gunshot wound at the hospital. B.J. ran out of the house again and back to

the Expedition where Webb eventually joined her and got into the passenger seat. Moore, Webb, and B.J. all drove off and headed to Dixon's to drop off heroin and pick up money that she owed. Outside Dixon's, Moore pulled B.J. aside and threatened her and her children's lives if she were to tell anyone about what happened to Brittany. Moore also wiped down Brittany's phone, handed it to B.J., and told her to get rid of it. B.J. drove down the street and threw Brittany's phone in the woods before returning to Dixon's.

[9] B.J., Moore, and Webb left Dixon's soon after and headed back to Indianapolis. They dropped off the Expedition at Moore's apartment in Beech Grove and then dropped off Webb at his apartment. At this point, B.J. and Moore were driving around in the Cadillac dropping off more heroin, and Moore "acted like nothing had just happened . . . he made the comment that that's how you take out competition. It was like a joke. Her life didn't mean anything." *Id.* at 207. Moore eventually dropped B.J. off at her house.

[10] The next day, B.J. was parked outside of a gas station when police surrounded her vehicle. Officers had discovered the previous night that B.J. may have been involved in Brittany's murder. Officers searched B.J. and found heroin and meth on her from the night before. They took B.J. to the police station and questioned her about what happened the previous evening. B.J. implicated Moore and then led officers to Jones's house where they found and arrested Moore.

On August 30, 2016, Moore was charged with felony murder, Level 1 felony burglary,[1] and Level 2 felony robbery resulting in serious bodily injury. While incarcerated and awaiting trial, Moore passed several notes to B.J. in effort to get her to change her story. A five-day jury trial commenced on April 3, 2017. And on April 7, the jury found Moore guilty as charged.

At Moore's sentencing hearing on May 8, 2017, the trial court merged Moore's robbery conviction with his felony murder conviction. The court then sentenced Moore to sixty-five years for felony murder and twelve years for Level 4 felony burglary to run consecutively for an aggregate seventy-seven-year sentence.

Moore now appeals.

## I.  Admission of Evidence at Trial

Moore first argues that the trial court abused its discretion when it admitted certain evidence at trial. We review challenges to admission of evidence at trial for prejudicial abuse of the trial court's discretion. *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). A trial court abuses its discretion by ruling in a way clearly against the logic and effect of the facts and circumstances before it, or by misinterpreting the law. *Id.* In reviewing whether an abuse of discretion was prejudicial, we assess the probable impact of the improperly admitted evidence on the jury in light of the properly admitted evidence. *Id.* If the conviction is supported by independent, properly admitted evidence of guilt such that there is

---

[1] This charge was later reduced to Level 4 felony burglary. *See* Tr. Vol. 6, pp. 171, 179.

little likelihood the improperly admitted evidence contributed to the verdict, the error is harmless. *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014).

[15] Specifically, Moore contends that the trial court erred when it admitted: (1) a video and two pictures of Moore and B.J. holding and shooting the rifle a couple weeks prior to the murder; and (2) evidence that Moore assaulted Crouch on the day of the murder. We address each in turn.

*A. Video and Photographs of Moore and B.J. Holding the Rifle*

[16] Moore maintains that the video and two photographs were improperly admitted at trial because they are not relevant. He asserts that because he was convicted under a theory of accomplice liability, "the fact that Moore and B.J. fired the weapon two weeks prior does not tend to prove any material element of the crimes charged." Appellant's Br. at 10–11.[2] The State responds that the videos and photographs are relevant because they show Moore and B.J. with the exact rifle used to commit the crime just two weeks prior to the murder. Appellee's Br. at 17. We agree with the State.

---

[2] We note that the trial court admitted the video and a photograph of Moore helping B.J. hold the rifle over an objection on relevancy grounds. However, Moore's counsel did *not* object to a photograph of Moore holding the rifle. *See* Tr. Vol. 4, p. 231. Therefore, our review of the admission of the photograph of Moore holding the rifle is for fundamental error. *See Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). But because we find that the trial court did not abuse its discretion in admitting the video or two photographs, we do not reach fundamental error. And to the extent Moore contends that the evidence was erroneously admitted as prior bad acts under Evidence Rule 404(b), the objection at trial on the video and the photograph of Moore holding the rifle with B.J. was for relevance, and thus we find this argument waived. *See Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017) (holding that grounds for objection not raised at trial are unavailable on appeal), *trans. denied.*

[17]     Our supreme court recently explained:

> Trial judges are called trial judges for a reason. The reason is that they conduct trials. Admitting or excluding evidence is what they do. That's why trial judges have discretion in making evidentiary decisions. This discretion means that, in many cases, trial judges have options. They can admit or exclude evidence, and we won't meddle with that decision on appeal. There are good reasons for this. Our instincts are less practiced than those of the trial bench and our sense for the rhythms of a trial less sure. And trial courts are far better at weighing evidence and assessing witness credibility. In sum, our vantage point—in a far corner of the upper deck—does not provide as clear a view.

*Snow v. State*, 77 N.E.3d 173, 177 (Ind. 2017) (citations and quotations omitted). While we provide trial courts a high level of deference, evidence must still be relevant in order to be properly admitted at trial. *Id.* And evidence is relevant if it has "any tendency" to prove or disprove a consequential fact. *Id.* (quoting *Escamilla v. Shiel Sexton Co. Inc.*, 73 N.E.3d 663, 668 (Ind. 2017)). This liberal standard for relevancy sets a low bar, and a trial court enjoys wide discretion when determining if the bar is cleared. *Snow*, 77 N.E.3d at 177.

[18]     Under the accomplice liability statute, a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." Ind. Code § 35-41-2-4. Moore notes that he "was convicted of Felony Murder based on accomplice liability." Appellant's Br. at 10. Therefore, it is reasonable for a factfinder to conclude that any piece of evidence that could tie Moore or other accomplices to the murder weapon would be relevant to the underlying murder. The video and two photographs of

Moore helping B.J. hold the rifle, and Moore holding the rifle just two weeks prior to the murder, are relevant to show access to the weapon Webb used to kill Brittany. We acknowledge that relevancy determinations can often "be resolved either way," *Snow*, 77 N.E.3d at 177, and we do not find that the trial court abused its discretion here when it admitted the video and two photographs.

*B. Moore's Assault on Crouch the Night of the Murder*

[19] Moore also argues that the evidence of his assault on Crouch should not have been admitted at trial because it "was presented solely to inflame the jury by showing Moore as having a violent character." Appellant's Br. at 13. But Moore's counsel never objected to any of the testimony regarding Moore's assault on Crouch. *See* Tr. Vol. 4, pp. 172–74; Tr. Vol. 5, p. 149. And our supreme court has explained, "The failure to make a contemporaneous objection to the admission of evidence at trial, so as to provide the trial court an opportunity to make a final ruling on the matter in the context in which the evidence is introduced, results in waiver of the error on appeal." *Brown v. State*, 783 N.E.2d 1121, 1125 (Ind. 2003). Thus, because Moore failed to object contemporaneously to the testimony during trial of his assault on Crouch, he has waived his right to appellate review on this issue.[3]

---

[3] Even if the trial court erred in admitting the video, two photographs, and evidence of Moore's assault on Crouch, it is all harmless. It is well settled that "[n]o error in the admission of evidence is ground for setting aside a conviction unless such erroneous admission appears inconsistent with substantial justice or affects the

## II. Sufficiency of the Evidence

[20]   Moore next contends that the evidence is insufficient to sustain his convictions. When reviewing a claim of insufficient evidence to sustain a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Jackson v. State*, 50 N.E.3d 767, 770 (Ind. 2016). It is the fact-finder's role, not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id*. We will affirm the conviction unless no reasonable fact-finder could have found the elements of the crime proven beyond a reasonable doubt. *Id*. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Drane v. State*, 867 N.E.2d 144, 146–47 (Ind. 2007).

[21]   Indiana Code section 35-42-1-1(2) provides that a person who "kills another human being while committing or attempting to commit . . . robbery . . ." commits felony murder. And under Indiana Code section 35-43-2-1, "[a] person who breaks and enters the building or structure of another person, with intent to commit a felony or theft in it, commits burglary . . .," which is elevated to a Level 1 felony if "the building or structure is a dwelling" and "it results in

substantial rights of the parties." *Wickizer v. State*, 626 N.E.2d 795, 800 (Ind. 1993). Moore has made no showing that the admission of evidence here affected his substantial rights. Moreover, the jury heard substantial testimony from B.J. about Moore's involvement in Brittany's murder. We cannot say that based on the facts and circumstances before us, there is a substantial likelihood that the challenged evidence substantially swayed the jury's verdict. *Cf. Thompson v. State*, 690 N.E.2d 224, 229–230 (Ind. 1997) (finding the error was not harmless when the State introduced and continuously referenced during trial evidence of a different murder by the defendant).

serious bodily injury to any person other than the defendant." I.C. § 35-43-2-1(4).[4] A dwelling is defined as "a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging." Ind. Code § 35-31.5-2-107.

[22] It is well settled that "a person is subject to conviction for felony murder based on accomplice liability for the underlying offense." *Luna v. State*, 758 N.E.2d 515, 517 (Ind. 2001). And burglary can similarly be based under a theory of accomplice liability. *Chappell v. State*, 966 N.E.2d 124, 130 (Ind. Ct. App. 2012), *trans. denied*. Thus, the State was required to prove that Moore "knowingly or intentionally aid[ed], induce[d], or cause[d] [Webb] to commit" felony murder and burglary. I.C. § 35-41-2-4. Moore contends "that the State did not present sufficient evidence that Moore aided, induced, or caused Webb to rob and shoot [Brittany]." Appellant's Br. at 15 (emphasis removed).

[23] On appeal, we consider several factors to determine whether Moore acted as an accomplice, including: "(1) presence at the scene of the crime; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime." *Wieland v. State*, 736 N.E.2d 1198, 1202 (Ind. 2000).

---

[4] Although the charge was eventually reduced to Level 4 felony burglary, the State was required to prove the elements of Level 1 felony burglary at the time of trial.

[24]   Moore alleges that he was merely a bystander at the scene of the crime. We disagree. In fact, the evidence introduced at trial does not remotely support Moore's assertion. Prior to leaving Crouch's home and heading to Brittany's, Moore obtained the rifle and told B.J., "We going to do what we talked about." Tr. Vol. 4, p. 174. Moore had previously told B.J. on several occasions "that if Brittany didn't buy dope from [them] that he was going to rob her over and over again[,] so she couldn't buy her own product from someone else." *Id.* at 176. And this is what B.J. believed Moore meant when he said that they were going to Brittany's to do what they had previously discussed. *Id.* at 177.

[25]   At Brittany's, Moore pulled his Cadillac into a parking lot directly adjacent to Brittany's home while B.J. and Webb approached the backdoor and eventually went inside. Thus, while Moore himself was not inside Brittany's apartment, he was present at the scene of the crime and for the duration of the offense. *Cf. Ward v. State*, 567 N.E.2d 85, 86 (Ind. 1991) (holding there was insufficient evidence to establish accomplice liability where defendant left after dropping off those who committed the crime).

[26]   After Webb shot Brittany, and B.J. came running out to Moore's vehicle, Moore told her to "get her f[******] ass back in the house and help [Webb] get the stuff." Tr. Vol. 4, p. 194. Moore was well aware of what had taken place inside Brittany's home, and he actively directed B.J. to go back inside and help Webb complete the crime. Therefore, Moore displayed companionship with both Webb and B.J. on the night of and during the commission of the crime, and he did nothing to oppose it from taking place—rather, he encouraged it.

After Moore, Webb, and B.J. left Brittany's and drove to Dixon's house nearby, Moore wiped down Brittany's phone and directed B.J. to dispose of it. At Dixon's, Moore also threatened B.J. and her children if she told anyone about what happened. And back in Indianapolis later that night, Moore concealed the murder weapon under a blanket, and made a comment to B.J., "that that's how you take out competition." *Id.* at 207.

From this evidence, a reasonable trier of fact could have determined beyond a reasonable doubt that Moore was guilty based on accomplice liability of the felony murder of Brittany and the burglary of her home. Moore's arguments to the contrary are nothing more than a request for us to reweigh the evidence before the jury, which we cannot and will not do.

## III. Double Jeopardy Concerns

Moore next argues that his conviction for felony murder based on robbery and his conviction for burglary violate Indiana's prohibition against double jeopardy under the actual-evidence test. Article 1, Section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." We review double jeopardy claims de novo on appeal. *Sloan v. State*, 947 N.E.2d 917, 920 (Ind. 2011). And we analyze alleged violations of Indiana's Double Jeopardy Clause pursuant to our supreme court's opinion in *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999). In *Richardson*, our supreme court held that:

> [T]wo or more offenses are the "same offense" in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the

actual evidence used to convict, the essential elements of one
challenged offense also establish the essential elements of another
challenged offense.

717 N.E.2d at 49 (emphasis in original).

[30] Under the "actual evidence" test, Moore must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish *all* of the essential elements of a second challenged offense. *Id.* at 53. And this court has explained:

> Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the jury's perspective[.] Therefore, we consider the essential elements of the offenses, the charging information, the jury instructions, the evidence, and the arguments of counsel. The term reasonable possibility turns on a practical assessment of whether the jury may have latched on to exactly the same facts for both convictions.

*Bunch v. State*, 937 N.E.2d 839, 845–46 (Ind. Ct. App. 2010), *trans. denied* (citations and quotations omitted).

[31] The instruction provided to the jury for felony murder by robbery required the State to prove, under a theory of accomplice liability, that:

1. [Moore]
2. killed
3. Brittany Sater, another human being,
4. while committing or attempting to commit robbery which is defined as:

    a. [Moore]
    b. knowingly
    c. took property from Brittany Sater or took property from the presence of Brittany Sater
    d. *by using or threatening the use of force* on Brittany Sater.

Appellant's App. Vol. 2, p. 163 (emphasis added). And the instruction provided to the jury for Level 1 felony burglary required the State to prove, under a theory of accomplice liability, that:

1. [Moore]
2. knowingly or intentionally
3. broke and entered
4. the building or structure of Brittany Sater
5. with the intent to commit a felony or theft in it, which is defined as:
    a. knowingly or intentionally
    b. *exerting unauthorized control* over property of Brittany Sater, another person
    c. with intent to deprive Brittany Sater of any part of the property's value or use.
6. and the offense was committed in a building or structure that was a dwelling and the offense resulted in serious bodily injury to Brittany Sater, who was a person other than a defendant.

*Id.* at 164 (emphasis added).[5]

---

[5] On the State's recommendation at sentencing, the trial court amended the Level 1 felony burglary to a Level 4 felony burglary in order to remove the serious bodily injury requirement, thereby alleviating double jeopardy concerns. *See* Tr. Vol. VI, pp. 171, 179.

[32] Moore argues that the evidence used to support the robbery portion of the felony murder conviction was the same that was used to support the burglary conviction. Specifically, he contends that Webb's use of the gun constituted both the threat and use of force for the robbery portion of the felony murder conviction, and that the same act satisfied the unauthorized control burglary element. Appellant's Br. at 20; Reply Br. at 7.

[33] Moore cites to our supreme court's decision in *Bradley v. State*, 867 N.E.2d 1282 (Ind. 2007), to support his position. In that case, the defendant stabbed his wife in the back and then followed her into the bathroom where he struck her over the head with a hammer. *Id.* at 1284. On appeal, Bradley argued that there was a reasonable probability that the jury used the evidence proving criminal confinement to also prove aggravated battery. Our supreme court agreed and explained, "From the evidence and instructions, it is reasonable that the jury *may also* have found the [required element of force] satisfied by the evidence of [defendant's wife's] open head injury inflicted by the defendant with the hammer." *Id.* at 1285. And because the *Bradley* court found "there is a reasonable probability that the jury used the same evidentiary facts to establish the essential elements of both criminal confinement . . . and aggravated battery. . . the Double Jeopardy Clause is violated." *Id.* However, *Bradley* is readily distinguishable from the case before us.

[34] Here, to find Moore guilty of felony murder the State was required to prove that Brittany died while his accomplice was committing or attempting to commit

robbery. As to the charge of felony burglary, the State was required to prove that Moore's accomplice broke or entered Brittany's home with an intent to commit theft, and that act resulted in serious bodily injury to Brittany. Therefore, the crime of burglary requires a breaking and entering, which is not required for the commission of murder while committing or attempting to commit robbery. And a breaking and entering was not required in order for the jury to convict Moore of felony murder. Therefore, the offenses of felony murder and burglary were each established by the proof of a fact not used to establish the other offense.

[35] Thus, although the evidence proving each offense—Webb's use of the rifle—also proved an element of the second offense, in neither case did the same evidentiary facts establish all of the essential elements of both offenses. *Cf. Bradley*, 867 N.E.2d at 1285; *see also Spivey v. State*, 761 N.E.2d 831, 834 (Ind. 2002). As a result, Moore has failed to demonstrate a violation of the Indiana Double Jeopardy Clause under the *Richardson* actual evidence test.

## IV. Appropriateness of the Sentence

[36] Finally, Moore alleges that his sentence is inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In conducting our review, "[w]e do not look to determine if the sentence was

appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008).

[37] Thus, although we have the power to review and revise sentences, the principal role of appellate review should be to attempt to "leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Id.* at 1225. It is Moore's burden on appeal to establish that his sentence is inappropriate. *Grimes v. State*, 84 N.E.3d 635, 645 (Ind. Ct. App. 2017), *trans. denied*.

[38] When considering the nature of the offense, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). The advisory sentence for murder is fifty-five years, with a sentencing range of forty-five to sixty-five years. Ind. Code § 35-50-2-3. And the advisory sentence for Level 4 felony burglary is six years, with a sentencing range of two to twelve years. Ind. Code § 35-50-2-5.5. Thus, Moore was ordered to serve the maximum sentence for both convictions.

[39] "Although the maximum possible sentences are generally most appropriate for the worst offenders, this rule is not an invitation to determine whether a worse

offender could be imagined, as it is always possible to identify or hypothesize a significantly more despicable scenario, regardless of the nature of any particular offense and offender." *Kovats v. State*, 982 N.E.2d 409, 416 (Ind. Ct. App. 2013). By stating that maximum sentences are ordinarily appropriate for the "worst offenders," we refer generally to the class of offenses and offenders that warrant the maximum punishment, which encompasses a considerable variety of offenses and offenders. *Id.* Accordingly, "[w]e concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character. *Wells v. State*, 904 N.E.2d 265, 274 (Ind. Ct. App. 2009), *trans. denied* (citing *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002)).

[40] Regarding the nature of the offense here, we first find Moore's statement that his "conduct was no more serious than the normal murder," appalling. Appellant's Br. at 20. Moore was set on robbing Brittany up to and until she bought drugs from him. And one of his accomplices shot Brittany in the abdomen and dragged her to the safe in her bedroom while she was still alive. After learning that Brittany had been shot, Moore directed B.J. to go back inside and help Webb finish the job rather than seeking medical assistance. Moore then instructed B.J. to get rid of Brittany's cell phone, he concealed the murder weapon, he threatened B.J. and her children if she said anything, and he told B.J., "that that's how you take out competition." Tr. Vol. 4, p. 207. The

nature of this heinous offense and Moore's participation in it does not support a finding that the maximum sentence here was inappropriate.

[41] Moore's character also does nothing to convince us that the maximum sentence was inappropriate. Moore has a lengthy criminal history including five prior felony convictions, two misdemeanor convictions, and a juvenile history that includes two adjudications for resisting law enforcement and battery if committed by an adult. He has been placed on probation three times and petitions to revoke were filed in two of them. Moreover, he was out on pre-trial release when he committed the current offense. While Moore was incarcerated for the current offense, he attempted to persuade B.J. to change her story, and he had five offense reports filed against him for inappropriate conduct.

[42] Based on the atrocious nature of the offense and Moore's character, we cannot say that the trial court's decision to impose two maximum sentences here is an "outlier" that should be reversed under our constitutional authority to review and revise sentences. *Caraway v. State*, 977 N.E.2d 469, 473 (Ind. Ct. App. 2012), *trans. denied.*

## Conclusion

[43] Based on the facts and circumstances before us, the trial court did not abuse its discretion when it admitted during trial a video and two photographs of Moore holding the murder weapon a couple weeks prior to Brittany's murder. Further, Moore failed to make a contemporaneous objection at trial to his alleged assault on Crouch, and therefore he waived his right to appellate review on the

introduction of that evidence. We also find that there was sufficient evidence to support Moore's convictions, there was no error under Indiana's Double Jeopardy clause, and Moore's sentence was not inappropriate. Accordingly, we affirm.

Bailey, J., and Barnes, J., concur.